UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:00CV2009 (EBB) |
| | : | |
| $662,310.79 IN UNITED STATES CURRENCY SEIZED FROM ACCOUNT NUMBER 100080907, HELD IN THE NAME OF FRANKLIN CREDIT SERVICES, INC., AT FIRST TENNESSEE BANK, FRANKLIN, TENNESSEE, | : : : : : : : : | |
| | : | |
| $146,000.00 AND $3,315.57 IN UNITED STATES CURRENCY SEIZED FROM ACCOUNT NUMBER 100057691, HELD IN THE NAME OF FRANKLIN CREDIT SERVICES, INC., AT FIRST TENNESSEE BANK, FRANKLIN, TENNESSEE, | : : : : : : : | May 12, 2004 |
| | : | |
| $185,000.00 IN UNITED STATES CURRENCY SEIZED FROM ACCOUNT NUMBER 100057691, HELD IN THE NAME OF FRANKLIN CREDIT SERVICES, INC., AT FIRST TENNESSEE BANK, FRANKLIN, TENNESSEE, | : : : : : : : | |
| | : | |
| $149,000.00 IN UNITED STATES CURRENCY SEIZED FROM ACCOUNT NUMBER 100057691, HELD IN THE NAME OF FRANKLIN CREDIT SERVICES, INC., AT FIRST TENNESSEE BANK, FRANKLIN, TENNESSEE, | : : : : : : : | SECOND AMENDED VERIFIED COMPLAINT OF FORFEITURE |
| | : | |
| Defendants. | : | |
| | : | |
| [CLAIMANT: FRANKLIN CREDIT SERVICES, INC.] | : : | |

Now comes the United States of America, Plaintiff herein, by and through its attorneys, John H. Durham, Acting United States Attorney for the District of Connecticut, and Julie G. Turbert, Assistant United States Attorney, and respectfully states as follows:

1.      This is a civil action in rem brought to enforce the provision of Title 18, United States Code, Section 981(a)(1)(A) for the forfeiture of currency involved in a financial transaction in violation of Title 18, United States Code, Sections 1956 and 1957.

2.      The Defendants are $662,310.79 in United States Currency seized from Account Number 100080907, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank, Franklin, Tennessee, $146,000.00 and $3,315.57 in United States Currency seized from Account Number 100057691, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank, Franklin, Tennessee, $185,000.00 in United States Currency seized from Account Number 100057691, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank, Franklin, Tennessee, and $149,000.00 in United States Currency seized from Account Number 100057691, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank, Franklin, Tennessee ("Currency Defendants").

3.      The Currency Defendants were seized on March 24, 2000, August 22, 2000, March 21, 2001, and April 15, 2004, respectively, by Special Agents of the Internal Revenue Service Criminal Investigation pursuant to a seizure warrant and a supplemental seizure warrant issued by the Honorable Peter C. Dorsey, Senior United States District Judge, on March 23, 2000; a second supplemental seizure warrant issued by the Honorable Ellen Bree Burns, Senior United States District Judge, on August 17, 2000; a third supplemental seizure warrant issued by

2

the Honorable Joan G. Margolis, United States Magistrate Judge, on March 21, 2001; and a fourth supplemental seizure warrant issued by the Honorable Joan G. Margolis, United States Magistrate Judge, on April 14, 2004.

### JURISDICTION AND VENUE

4.    This court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355.

5.    Venue in the District of Connecticut is proper by virtue of 28 U.S.C. § 1395.

### BACKGROUND OF INVESTIGATION

6.    Since before May of 1999, the Internal Revenue Service Criminal Investigation Division and Federal Bureau of Investigation have been investigating a fraudulent scheme involving Martin R. Frankel. During the course of the investigation, it was learned that since 1991, Martin R. Frankel, operating under several different aliases and corporate entities, devised and executed a scheme to defraud several insurance companies in several different states utilizing interstate wire communications and to launder the proceeds of that fraud, in violation of 18 U.S.C. §§1956 and 1957.

7.    Frankel, through fraudulent pretenses, representations and promises, obtained control of the liquid assets and insurance policy premium proceeds of these companies through acquisition, reinsurance or other agreements, and ostensibly invested these assets in government securities through a brokerage company known as Liberty National Securities, Inc. ("LNS, Inc."), which he operated using the alias Eric Stevens from 889 Lake Avenue, Greenwich, Connecticut, in the District of Connecticut and elsewhere. Frankel systematically drained these assets through various financial accounts and transferred them into accounts in and outside this country under

3

his control and for his own use. Frankel then laundered these funds, purchasing difficult to trace assets and paying for the expenses of his operations in this country and otherwise. Frankel directed the laundering of these funds from 889 Lake Avenue, Greenwich, Connecticut.

8.    Approximately two years ago, the GPD investigated an incident at 881 Lake Avenue, Greenwich, Connecticut. At that time, an entity known as Sundew International was the lessee of 881 Lake Avenue. In connection with the investigation of that incident, the GPD interviewed Martin Frankel at 889 Lake Avenue, a property which was also rented by Sundew International. The interview took place in an office-type room that had numerous computer monitors displaying information from various financial markets. During that interview, Frankel advised the Greenwich Police officers that he traded in the various markets on behalf of Sundew International.

9.    Martin R. Frankel was banned on December 1, 1992, from trading in securities or from association with any broker, dealer, investment adviser, investment company or municipal securities dealer by the Securities and Exchange Commission.

10.    On May 5, 1999, the Greenwich Fire Department ("GFD") received notification from the private security company responsible for the alarm system at 889 Lake Avenue in Greenwich, Connecticut, that there was an active fire alarm at that address. The real property located at 889 Lake Avenue was one of the residences of Martin R. Frankel and is currently the subject of a civil forfeiture action entitled United States v. One Parcel of Property Located at 889 Lake Avenue, Greenwich, Connecticut, Civil No. 3:99CV979 (RNC).

11.    The security firm advised GFD that it had called 889 Lake Avenue and that an unknown female had answered the telephone. The unknown female stated that there was no fire

4

and that the premises were secure. However, when queried, the female was unable to provide the security code for the alarm system.

12.    Thereafter, the GFD was dispatched to 889 Lake Avenue. Upon arrival, the premises appeared empty, but smoke could be seen on the first floor level. GFD personnel located a door that was not locked and the locking mechanism for the door appeared to be missing. Upon entry into the premises GFD personnel observed two fireplaces ablaze, stuffed with various paper records and materials, and a metal filing cabinet on fire, containing paper records and materials, in the kitchen near one of the fireplaces. GFD personnel observed that shredded documents had been used as an accelerant to the fires; that the fires were not controlled; that nearby furniture had been scorched from the flames, and that used fire extinguishers near the fires indicated that someone had tried to douse the flames.

13.    Personnel from the GFD and GPD attempted to determine whether there was any person on the premises who may have been in need of assistance. However, as they attempted to do so, they encountered several rooms that had been locked with cypher locks. In order to enter these rooms, the GFD and GPD personnel had to remove the molding from around the doors and then gain entrance.  In performing this emergency search, GFD and GPD personnel observed that the residence had been converted into a business office. The garage contained three offices; each bedroom contained office equipment, and the first floor contained offices as well. Additionally, the house appeared to have been ransacked; furniture was upended; boxes of files were strewn about; and the premises were in a general state of disarray.

14.    After the fires were brought under control, the GPD, based upon the apparent arson and breaking and entering, secured a search warrant for 889 Lake Avenue. The GPD

5

recovered numerous charred documents which were pulled from the fires, boxes of other records and materials from within the residence, and various other items. During the course of its investigation, the GPD interviewed several neighbors. On Tuesday, May 4, 1999, the day before the fires, neighbors observed a white moving van at 889 Lake Avenue. The investigation also revealed that the telephones in the house had been placed on an automatic call forward system.

15.    Additionally, during the search of 889 Lake Avenue by the GPD, two limousine drivers arrived at the premises. Each indicated that he was a driver for employees who worked at 889 Lake Avenue. Each was at the premises in order to pick up his pay check. Neither had been informed that the business was no longer in operation. One of the drivers, however, advised that during the previous week he had witnessed employees engaging in a significant amount of document shredding and removing computers from the premises. He further advised that other drivers had told him that a number of employees had been taken to the airport and during the trip discussed passports.

16.    Paperwork recovered during the search revealed that the house at 889 Lake Avenue had been set up as a brokerage office with what appeared to be an active trading floor, and that in excess of 80 computers and various telecommunications equipment were used to provide a continual flow of financial and trading market information. Indeed, one document, a contract between Gates Investments, Inc. of 889 Lake Avenue and the New York Stock Exchange for the use of Market Data, identifies a computer network indicating 4 separate servers with 25 different work stations, each wired to receive up to the minute market data. This contract was signed on behalf of Gates Investments, Inc. by "Mike King."

17.    The records recovered reveal that there were numerous business entities operating out of the premises, and that these were operated at the direction of Martin Frankel, using several aliases, and his employees. The records indicate that Frankel at times established various entities and used certain aliases in order to conduct particular sets of transactions.

18.    A portion of the records indicate that Frankel operated Gates Investments Inc. at 889 Lake Avenue. Frankel used the name "Michael King" as the president of Gates Investments. Gates Investments has numerous contracts with various market data providers including the New York Stock Exchange and the NASDAQ.

19.    Records recovered also reflect that Frankel operated a business entity known as American Security Services (ASS), ostensibly of San Jose, California. The check register for ASS revealed that Martin Frankel had signatory authority on the checking account for ASS. Additionally, ASS used an address in Greenwich, Connecticut which was traced back to a Mail Boxes Etc.

20.    Records for Sundew International, Ltd. were recovered from 889 Lake Avenue, revealing that Frankel operated that business at the premises. These included a copy of a contract for employment between Martin R. Frankel and Sundew International, Ltd. reflecting a salary of $700,000 per year for "consulting services."

21.    Records seized also reflect various investment accounts bearing the entity name of the "Jupiter" fund which accounts appear to have been managed out of 889 Lake Avenue.

22.    Several internal memoranda seized reflect that Martin Frankel used the name David Rosse. The real David Rosse was Frankel's associate and employee who was in charge of security at 889 Lake Avenue.

7

23.    Members of law enforcement investigating this matter maintain that based upon their training and experience, the use of numerous corporate and other entities and aliases is often associated with fraudulent activity and money laundering. The use of numerous identities often thwarts law enforcement efforts to identify individuals, confuses would-be victims, and conceals the nature, source and control of the illegally obtained proceeds.

24.    On Thursday, May 6, 1999, the GPD received a telephone call from an individual identifying himself as Martin R. Frankel. Mr. Frankel inquired as to what was occurring at his residence. The GPD told Mr. Frankel about the fire and the state of the property. The GPD also told Mr. Frankel that they wished to speak with him and inquired where he was calling from. Mr. Frankel would not say where he was and declined to go to the Police Department for an interview.

25.    On May 16, 1999, the Honorable Holly B. Fitzsimmons, United States Magistrate Judge for the District of Connecticut, issued a warrant for the arrest of Martin R. Frankel for one count of money laundering in violation of 18 U.S.C. § 1957 and one count of wire fraud in violation of 18 U.S.C. § 1343. A second warrant for arrest was issued by the Honorable Holly B. Fitzsimmons, United States Magistrate Judge for the District of Connecticut, on July 13, 1999, for the arrest of Martin R. Frankel for three counts of money laundering in violation of 18 U.S.C. § 1956 and one count of wire fraud in violation of 18 U.S.C. § 1343.

26.    On October 7, 1999, Martin Frankel, a/k/a David Rosse, a/k/a Eric Stevens, a/k/a Mike King, was indicted by a federal grand jury in the District of Connecticut charging him with twenty counts of wire fraud in violation of 18 U.S.C. § 1343, thirteen counts of money laundering in violation of 18 U.S.C. § 1956(a)(2), one count of participating in a Racketeer

8

Influenced and Corrupt Organization (RICO) in violation of 18 U.S.C. § 1962(c), one count of

Conspiracy to Participate in Racketeer Influenced and Corrupt Organization in violation of 18

U.S.C. § 1962(d), and one count of securities fraud in violation of 15 U.S.C. § 78j(b).

27.    After being apprehended by German law enforcement authorities in Hamburg

Germany on September 4, 1999, and serving a prison term in Germany. Martin Frankel was

extradited to the United States from Germany. Martin Frankel was initially presented before the

federal district court on Sunday, March 4, 2001, and then arraigned before the Honorable Joan G.

Margolis on Monday, March 12, 2001 on racketeering, money laundering and wire fraud charges.

On May 15, 2002, Martin Frankel pleaded guilty to twenty-three of the previously listed counts

and is awaiting sentencing by the Court.

<u>INVESTIGATION OF FRAUDULENT SCHEME OF MARTIN FRANKEL</u>

28.    On Monday, May 10, 1999, attorneys acting on behalf of the subsidiaries of

Franklin American Corporation ("FAC"), contacted personnel at the U.S. Attorney's Office and

informed them that they had several hundred million dollars on account in the name of First

National Life Insurance Company of America ("FNLIC") which account was under the control of

LNS, Inc. FNLIC was a wholly owned subsidiary of FAC. A portion of the money believed to

be on account with LNS, Inc. had ostensibly been provided by an entity called the Saint Francis

of Assisi Foundation (SFAF).

29.    Documents recovered from 889 Lake Avenue and discussions with counsel for

the Foundation reveal that Frankel, using the alias David Rosse, controlled the St. Francis of

Assisi Foundation.

9

30.    On or about April 29, 1999, FAC, at the direction of Mississippi state insurance regulators, decided to liquidate or convert the holdings that were with LNS, Inc, and advised LNS, Inc. to convert or liquidate its holdings of approximately $161 million, which LNS, Inc. personnel indicated would be executed. FAC understood from discussions with Martin Frankel that the funds from the transaction would be cleared through Depository Trust Company in New York. Information obtained from the Depository Trust Company reveals that it has no relationship with LNS, Inc.

31.    To date, neither FAC nor its subsidiaries have received these monies, which they believed were on deposit with LNS, Inc. Based on the information above it appears that Martin Frankel and his employees at 889 Lake Avenue and other associates of Frankel absconded with these funds and that the anticipated return of these funds to the subsidiaries of FAC prompted the hasty departure from the premises at 889 Lake Avenue.

32.    Records recovered from 889 Lake Avenue reflect LNS, Inc. operated out of 889 Lake Avenue. One of the telephone numbers for LNS, Inc., provided to FAC was (800) 382-3950. Records recovered from the residence at 889 Lake Avenue reflect this number one of the telephone lines, "Line 12" to be precise, at 889 Lake Avenue that was used by Frankel in his trading operations. A memorandum recovered from 889 Lake Avenue contains an admonition to all employees that Line 12 is to be answered "Trading Services" and there are to be no outgoing calls made on Line 12. FAC officials have advised that LNS, Inc. used addresses at 82 Wall Street, Department 1105, New York, New York, and 405 Tarrytown Road, Suite 212, White Plains, New York. Both of these addresses are post office box mail drops.

10

33.     Broker-dealer registration records of the National Association of Securities Dealers and the Securities and Exchange Commission reflect that LNS, Inc. is a registered broker dealer operated in Dundee, Michigan and does not have an office in Connecticut or New York. According to those records, LNS, Inc. is controlled by an individual named Robert Guyer. Further, records received from Banque SCS Alliance pursuant to a Mutual Legal Assistance Treaty request reveal that Guyer received monthly payments of $2,000 from Frankel's account at Banque SCS Alliance.

34.     Records recovered at the premises also suggest that the individuals operating out of 889 Lake Avenue were engaged in Money Laundering in violation of Title 18, United States Code, Sections 1956 and 1957. Among the charred documents pulled from the fire was a handwritten "to do" list. Item Number 1 on that list stated: "Launder money." Item Number 2 on that list stated: "Get $ to Israel get it back in." Members of law enforcement investigating this matter maintain that based upon their training and experience, the second item is a reference to money laundering.

35.     Moreover, it appears that Martin Frankel had an interest in Astrological Charts and their ability to predict the future. Recovered among his records were astrological charts created to answer the following questions: (1) "Will I go to prison?"; (2) "Will Tom turn me in?"; (3) Should I leave?";  (4) "Should I wire money back from overseas?" and (5) "Will I be safe?." Additional documents recovered included research on extradition from various countries, including Brazil, as well as the anonymous banking practices of at least one foreign country.

36.     FAC subsidiaries as well as subsidiaries of the International Financial Corporation (IFC) in  the states of Mississippi, Tennessee, Oklahoma and Missouri have been

11

placed in receivership by the insurance regulators of those States. IFC was a holding company of insurance companies who had also invested assets with Frankel operating as LNS, Inc. Mississippi state regulators and special agents of the FBI and IRS CID have talked to FAC and IFC officials, who indicated that since 1991, FAC, IFC and their subsidiaries had transferred a substantial amount of their liquid assets and insurance policy proceeds (up to 90 percent of the liquid assets of each company) to LNS, Inc., 405 Tarrytown Road, Suite 212, White Plains, New York, with the understanding that LNS, Inc., on behalf of the insurance companies would invest these funds in U.S. Treasury notes and other government securities. Custodial agreements between a number of these insurance companies and LNS, Inc. reflect that LNS, Inc. agreed to provide for the safekeeping and investment of the assets of these companies, subject to the subsidiaries' instructions and withdrawal upon demand.

37.    Mississippi State insurance regulators have determined that as of March 31, 1999, FAC or IFC subsidiaries in that state had transferred approximately $161 million to LNS, Inc. In addition, the same regulators have determined that the FAC or IFC subsidiaries and affiliated companies in Missouri and Oklahoma had transferred as much as $117 million and $12.6 million, respectively, to LNS, Inc. as of March 31, 1999. These transfers were made to accounts controlled by LNS, Inc. and Frankel at Dreyfus Company and Prudential Securities.

38.    Mississippi and Virginia insurance regulators have also determined that on or about April 9, 1999, pursuant to a reinsurance agreement between Settlers Life Insurance Company of Bristol, Virginia and FNLIC, Settlers transferred over $44 million to the FNLIC account at the First National Bank of Tennessee. This is demonstrated by the wire instructions for that transaction written by the Chief Executive Officer of Settlers Life Insurance Company.

12

Upon receipt of the over $44 million, FNLIC transferred these funds to a Dreyfus Cash Management account in the name of FNLIC, which is under the supervision of LNS, Inc., 450 Tarrytown Road, Suite 212, White Plains, New York, as the dealer for the account. On or about April 12, 1999, these funds were wired out of the FNLIC Dreyfus cash management account to Banque SCS Alliance SA, in Geneva, Switzerland, Account No. 70026 in the name of Bloomfield Investments, Ltd.

39.    In addition to accounts maintained at Dreyfus Company for the insurance companies, similar accounts were maintained at Prudential Securities. Frankel, using the alias David Rosse, also maintained a Prudential Securities account in the name Bloomfield Investments, Ltd. Documents recovered from 889 Lake Avenue reveal that Frankel operated this and other accounts in the name of Bloomfield Investments, Ltd. and Bloomfield Investments Inc. from that location, but listed the address of this entity as 309 Mamaroneck Avenue, Suite 350, White Plains, New York. That address is identified as a post office box maildrop. On March 15, 1999, Frankel, caused Prudential Securities to transfer approximately $30 million from the Bloomfield Investments, Ltd. account through UBS Stamford to the Banque SCS Alliance account No. 70026 in the name of Bloomfield Investments, Ltd. Based upon the information above, it is believed that Frankel, among other acts, siphoned funds from the Prudential insurance company accounts into the Prudential Bloomfield Investment account before transferring the funds to the Banque SCS Alliance Bloomfield Investments, Ltd. account.

40.    Based upon the review of documents recovered from 889 Lake Avenue, Greenwich, Connecticut, law enforcement has learned that Martin Frankel controls the Banque SCS Alliance Bloomfield Investments, Ltd. account and has used it to fund his illicit trading and

13

financial operation at 889 Lake Avenue. Several wire transfers recovered from there dated March 26, 1999 and April 5 and 6, 1999, establish that this account was used to pay the various bills associated with the illicit operation at that location including payroll, vendors, employee expenses and payments to Good Luck Corporation and Lucky Star Investments, Inc. Documents recovered from 889 Lake Avenue reveal that Frankel controlled these corporations as well.

41.    A review of the records received from Banque SCS Alliance revealed that over the course of over 8 years, Frankel regularly deposited, by wire transfer, millions of dollars from accounts in the United States. A review of those records also reveal that numerous wire transfers were made from the Banque SCS Alliance account to associates of Frankel in order to fund the illegal operation. The investigation has failed to disclose any other source of income or monies for Martin Frankel for the years in question other than his receipt and control of the insurance company assets. Based upon the above, the investigators have concluded that all of the funds which were deposited into the Banque SCS Alliance (and which were then used to fund the illegal operation at 889 Lake Avenue) were converted and stolen from the insurance companies.

## TRANSFER OF FRAUD PROCEEDS TO THE ACCOUNT OF FRANKLIN CREDIT SERVICES, INC.

42.    During the fraud scheme outlined above, one of Frankel's associates, Franklin American Corporation CEO, John A. Hackney, directed the formation of Franklin Credit Services, Inc. (FCS) in the State of Tennessee, which was funded with fraud proceeds from Frankel's Banque SCS Alliance Account. Hackney recruited Harrison Crabtree to be President of FCS. Crabtree runs the day-to-day operations of FCS.

14

43.    FCS is endorsed by the Tennessee Funeral Directors Association. As part of its business, FCS buys funeral loan contracts from Tennessee funeral homes. FCS collects the receivables from the individuals over the term of the loan.

44.    FCS was funded via wire transfers from Bloomfield Investment, Ltd., Account Number 70026 at Banque SCS Alliance, into Account Number 100057691, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank, Franklin, Tennessee. Employees of FCS have confirmed that these funds were used to fund the operation of Franklin Credit Services, Inc.

45.    Beginning on November 26, 1997 and concluding on April 16, 1999 twenty-one (21) wire transfers totaling $2,076,025.27 from Account Number 70026 at Banque SCS Alliance were deposited into Account Number 100057691 at First Tennessee Bank. These monies were used to purchase the funeral loan contracts.

46.    The following is a summary of the twenty-one (21) wire transfers directed by Frankel from his Bloomfield Investments, Ltd. Account Number 70026 at Banque SCS Alliance into Account Number 100057691, held in the name of Franklin Credit Services, Inc. at First Tennessee Bank:

|  | AMOUNT TRANSFERRED | DATE |
|---|---|---|
| 1. | $150,052.93 | 11/26/97 |
| 2. | $ 30,187.44 | 01/07/98 |
| 3. | $ 16,400.66 | 02/12/98 |
| 4. | $ 14,817.62 | 03/13/98 |
| 5. | $ 16,398.57 | 03/31/98 |
| 6. | $115,872.05 | 04/27/98 |
| 7. | $115,975.68 | 06/04/98 |
| 8. | $ 15,049.29 | 07/01/98 |
| 9. | $100,048.61 | 07/10/98 |
| 10. | $115,328.77 | 08/03/98 |
| 11. | $114,725.88 | 08/24/98 |

15

| | | |
|---|---|---|
| 12. | $200,052.74 | 09/09/98 |
| 13. | $ 13,256.69 | 10/13/98 |
| 14. | $213,392.11 | 11/04/98 |
| 15. | $ 12,315.34 | 12/03/98 |
| 16. | $200,055.49 | 12/10/98 |
| 17. | $ 12,034.36 | 12/29/98 |
| 18. | $200,054.28 | 01/22/99 |
| 19. | $209,878.37 | 02/19/99 |
| 20. | $ 10,076.45 | 04/14/99 |
| 21. | $200,049.94 | 04/16/99 |

47.    On March 17, 2000, the Honorable Joan G. Margolis, United States Magistrate

Judge issued a seizure warrant for Account Number 100057691, held in the name of Franklin

Credit Services, Inc., at First Tennessee Bank.  Upon execution of the warrant, a Special Agent

of the Internal Revenue Service Criminal Investigation Division learned that this account was a

checking account linked with a savings account, and that funds were transferred between these

two accounts on a daily basis.  Specifically, it was learned that all monies deposited into the

checking account were automatically transferred to the savings account pursuant to an automated

repurchase agreement with the account holder.  Also as part of the arrangement with the bank,

funds were transferred from the savings account to the checking account to satisfy any drafts

against the checking account.  In addition, any amounts transferred from the savings account in

excess of that needed to cover the drafts against the checking account were returned to the

savings account on a regular basis.

48.    At the time the Special Agent attempted to execute the warrant issued for

checking Account Number 100057691, it was learned that additional funds were located in

connected savings Account Number 100080907 as a result of transfers to and from the checking

account.  Based upon the nature of the automated repurchase agreement, the twenty-one (21)

16

wire transfers into checking Account Number 100057691 were subsequently transferred into connected savings Account Number 100080907. Consequently, the March 17, 2000, seizure warrant for checking Account Number 100057691 was not executed by law enforcement.

49.     On March 24, 2000, pursuant to a seizure warrant issued by the Honorable Peter C. Dorsey, Senior United States District Judge, for Account Number 100080907, the Internal Revenue Service seized $662,310.79 from this account at First Tennessee Bank.

50.     Also on March 24, 2000, pursuant to a supplemental seizure warrant issued by the Honorable Peter C. Dorsey, Senior United States District Judge, for Account Number 100057691, the Internal Revenue Service seized $3,315.57 from this account at First Tennessee Bank.

51.     On August 22, 2000, the Internal Revenue Service executed a second supplemental seizure warrant which was issued by the Honorable Ellen Bree Burns, Senior United States District Judge, and seized $146,000.00 from Account Number 100057691, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank.

52.     The Internal Revenue Service Criminal Investigation subsequently learned that $185,000.00 had been deposited into Account Number 100057691 which represented receivables derived from funeral loan contracts previously purchased by FCS as set forth above. A third supplement seizure warrant was issued by the Honorable Joan G. Margolis, United States Magistrate Judge, for Account Number 100057691 on March 21, 2001. On March 23, 2001, pursuant to the warrant, the Internal Revenue Service seized $185,000.00 from this account.

53.     The Internal Revenue Service Criminal Investigation subsequently learned that an additional $149,000.00 had been deposited into Account Number 100057691 which represented

receivables derived from funeral loan contracts previously purchased by FCS as set forth above. A fourth supplement seizure warrant was issued by the Honorable Joan G. Margolis, United States Magistrate Judge, for Account Number 100057691 on April 14, 2004. On April 15, 2004, pursuant to the warrant, the Internal Revenue Service seized $149,000.00 from this account.

54.    The Defendants, $662,310.79 in United States Currency seized from Account Number 100080907, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank, Franklin, Tennessee, $146,000.00 and $3,315.57 in United States Currency seized from Account Number 100057691, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank, Franklin, Tennessee, and $185,000.00 in United States Currency seized from Account Number 100057691, held in the name of Franklin Credit Services, Inc., at First Tennessee Bank, Franklin, Tennessee, and $149,000.00 in United States Currency seized from Account Number 100057691, represent currency which was involved in financial transactions or attempted transactions in violation of 18 U.S.C. § 1956 and 1957, and the Currency Defendants are, therefore, subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that Warrants of Arrest In Rem for the Currency Defendants be issued; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Currency Defendants to be condemned and forfeited to the United States of America for disposition

18

according to law; and that the United States of America be granted such other and  further relief

as this court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

JOHN H. DURHAM
ACTING UNITED STATES ATTORNEY

JULIE G. TURBERT
ASSISTANT U.S. ATTORNEY
P.O. BOX 1824
NEW HAVEN, CT  06508
(203) 821-3700
FEDERAL BAR # ct23398

## DECLARATION

I am a Special Agent for the Internal Revenue Service Criminal Investigation, United States Department of Treasury, and the case agent assigned the responsibility for this case.

I have read the contents of the foregoing Second Amended Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of May, 2004.

KEVIN MISCHKE
SPECIAL AGENT
INTERNAL REVENUE SERVICE
CRIMINAL INVESTIGATION

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the within and foregoing Second Amended Verified

Complaint of Forfeiture has been mailed, postage prepaid, on this 12th day of May, 2004, to:

Graham Matherne, Esq.
Wyatt Tarrant & Combs
2525 West End Avenue, Suite 1500
Nashville, Tennessee 37203

Charles G. Copeland, Esq.
Copeland, Cook, Taylor & Bush, P.A.
P.O. Box 6020
Ridgeland, Mississippi

Douglas J. Schmidt, Esq.
Blackwell Sanders Peper Martin, LLP
2300 Main Street, Suite 1000
Kansas City, Missouri 64108

Susan Loving, Esq.
Lest, Loving and Davies
1505 South Renaissance Boulevard
Edmund, Oklahoma 73013-3018

Steve A. Uhrynowycz, Esq.
Arkansas Insurance Department
Liquidation Division
1200 West Third Street, Room 340
Little Rock, AR 72201-1904

Forrest B. Lammiman, Esq.
Lord, Bissell & Brook
115 S. LaSalle Street
Chicago, Illinois 60603

Lane Wharton, Esq.
Bode, Call and Stroup
3101 Glenwood Avenue, Suite 200
Raleigh, North Carolina 27612

David Slossberg, Esq.
Hurwitz & Sagarin, LLC
147 North Broad Street
Milford, CT 06460

James J. Calder, Esq.
Rosenman & Colin, LLP
575 Madison Avenue
New York, NY 10022-2585

Douglas S. Skalka, Esq.
Neubert, Pepe & Monteith
195 Church Street
New Haven, CT 06510

JULIE G. TURBERT
ASSISTANT U.S. ATTORNEY

21